IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

NRS PROPERTIES, LLC V. RESILENT, LLC

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

NRS PROPERTIES, LLC, APPELLANT AND CROSS-APPELLEE,
V.
RESILENT, LLC, DOING BUSINESS AS DIGITAL DEFENSE, APPELLEE,
AND STEVE CAMPISI, APPELLEE AND CROSS-APPELLANT.

Filed July 29, 2014.    No. A-13-494.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Reversed and remanded for further proceedings.

Daniel S. Ryberg for appellant.

James D. Sherrets and Diana J. Vogt, of Sherrets, Bruno & Vogt, L.L.C., for appellee Steve Campisi.

INBODY, Chief Judge, and IRWIN and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

NRS Properties, LLC (NRS), entered into a commercial lease agreement with Resilent, LLC, doing business as Digital Defense. Steve Campisi signed a "personal guarantee" for lease obligations on behalf of Resilent. NRS brought this breach of contract action, alleging that Resilent breached the lease agreement and seeking damages. NRS appeals the district court's verdict, which awarded NRS damages. On appeal, NRS asserts that the district court erred in finding a damages provision in the contract to be ambiguous and in computing damages under a different damages provision in the contract. Campisi cross-appeals the district court's verdict. Campisi asserts on cross-appeal that the district court erred in finding that NRS proved its prima facie case, in failing to grant a directed verdict to Campisi, and in awarding any damages to NRS.

- 1 -

We find no error in the district court's conclusion that one provision of the lease agreement was ambiguous, but we reverse the district court's conclusion that another provision is applicable. We find no merit to the cross-appeal. As such, we reverse, and remand for further proceedings.

## II. BACKGROUND

In May 2005, a commercial lease was entered into between SMWK LLC, a predecessor in interest to NRS, and Resilent. Campisi signed a "personal guarantee" of "the payment of the rent and the performance of all of the covenants under the Lease and all renewals and extensions thereof by [Resilent]." At the time, Campisi was the president of Resilent.

The lease was for a term of 10 years, beginning August 1, 2005, and ending July 31, 2015. The lease required Resilent to pay base rent, as well as a pro rata share of operating expenses for the building, parking areas, and grounds. The lease included provisions for late charges for any monthly rent payment that was not timely made, and required a security deposit.

The lease included a provision prohibiting assignment or subletting "without the prior written consent of [NRS]."

Paragraph 17 of the lease provided a list of specific events which would "constitute a default or a breach of [the lease] by [Resilent]." Those events included Resilent's failing to pay any rent or other payments when due; Resilent's vacating or abandoning the premises; Resilent's filing for bankruptcy or reorganization; the commencement of involuntary bankruptcy or insolvency proceedings against Resilent; and Resilent's failing to perform or comply with any other term or condition of the lease, if such nonperformance continued for a period of 10 days after notice thereof by NRS.

Paragraph 18 of the lease provided for the "EFFECT OF DEFAULT." That paragraph provided as follows:

18. EFFECT OF DEFAULT. In the event of any default or breach hereunder, in addition to any other right or remedy available to [NRS], either at law or in equity, [NRS] may exert any one or more of the following rights:

(a) [NRS] may re-enter the Premises immediately and remove the property and personnel of [Resilent], and shall have the right, but not the obligation, to store such property in a public warehouse or at a place selected by [NRS], at the risk and expense of [Resilent], [NRS] must give notice to [Resilent] ten (10) days prior to removal of property and personnel.

(b) [NRS] may retake the Premises and may terminate this Lease by giving written notice of termination to [Resilent]. Without such notice, [NRS'] retaking will not terminate the Lease. On termination, [NRS] may recover from [Resilent] all damages proximately resulting from the breach, including the cost of recovering the Premises and the difference between the rent due for the balance of the Lease term as though the Lease had not been terminated, and the fair market rental value of the Premises, which sum shall be immediately due from [Resilent].

(c) [NRS] may relet the Premises or any part thereof for any term without terminating this Lease, at such rent and on such terms as it may, choose. [NRS] may make alterations and repairs to the Premises. In addition to [Resilent's] liability to [NRS]

for breach of this Lease, [Resilent] shall be liable for all expenses of the reletting, for any alterations and repairs made, for the rent due for the balance of the Lease term, which sum shall be immediately due [NRS] from [Resilent]. The amount due [NRS] will be reduced by the net rent received by [NRS] during the remaining term of this Lease from reletting the Premises, r [sic] any part thereof. If during the remaining term of this Lease [NRS] receives more than the amount due [NRS] under this sub-paragraph, [NRS] shall pay such excess to [Resilent], but only to the extent [Resilent] has actually made payment pursuant to this sub-paragraph.

Campisi testified that shortly after the lease agreement was executed, he sold Resilent and "became a minority partner." He testified that he sold Resilent to an individual who "came in . . . and brought in his own management team to basically take it over and push [Campisi] out." Campisi testified that he had no contact with people at Resilent as of December 2008, until discussions about assets and disposition shortly prior to the trial in this case.

At some point, Resilent ceased doing business and ceased using the leased office space. Resilent made its last payment under the lease agreement in April 2010.

Anthony Siahpush, the owner and president of NRS, testified that he contacted Resilent in May 2010 concerning its abandonment of the leased premises. He testified that he was notified that Resilent had abandoned the lease and that Resilent had "responded" to NRS that Campisi was "the personal guarantor for the lease."

Siahpush was asked, "So you decided not to consider the lease terminated; is that right?" He responded, "That is correct." He testified that NRS eventually retook possession of the leased premises in July 2010.

In June 2010, NRS filed a complaint in the district court, alleging breach of contract and seeking damages. NRS named both Resilent and Campisi as defendants. NRS alleged that Resilent had refused and failed to pay rent and had abandoned the leased premises, and alleged that notice of the breach and intent of NRS to reenter the leased premises had been mailed from NRS to Resilent.

In its complaint, NRS alleged that Resilent owed outstanding rent payments, late charges, operating expenses, and other damages set forth in the lease agreement. NRS alleged that Campisi had personally signed the lease and a "personal guarantee" of Resilent's performance and that, as a result, he was liable in the same amounts as Resilent. NRS sought a minimum of $79,630.12 in damages.

NRS was unsuccessful in its attempt to secure service against Resilent, leaving Campisi as the only defendant. In April 2012, a jury trial was held on NRS' complaint. The jury returned a verdict in favor of NRS and awarded damages in the amount of $49,779.18. NRS filed a motion for new trial or to alter or amend the verdict. Campisi filed a motion for remittitur, seeking to have the verdict reduced to $0.

The district court granted NRS' motion for new trial and vacated the jury's verdict. The court concluded that the jury had erred in its assessment of damages, the verdict was not sustained by the evidence, and the court had erred in its jury instructions. The court denied Campisi's motion for remittitur.

Campisi then attempted to appeal to this court. This court dismissed the appeal for lack of jurisdiction.

In May 2013, the parties agreed to waive a jury trial and instead conducted a bench trial. Prior to trial, the district court indicated its belief that paragraph 18(b) (Paragraph 18(b)) was the appropriate provision for computing NRS' damages. NRS argued to the district court that it had not elected to terminate the lease and was not seeking damages under Paragraph 18(b) of the lease agreement. The district court granted a motion in limine to prevent NRS from calling an expert witness to testify about the fair market rental value of the premises, specifically finding:

> And that being the case, that [NRS] does not consider the lease terminated[, NRS] will not be allowed to call an expert and probably doesn't need one and we will proceed under the -- the claim of [NRS] that it does not consider the lease . . . to have been terminated by [Resilent].

The trial primarily consisted of the testimony of Siahpush on behalf of NRS and Campisi in his own behalf.

Siahpush testified that upon learning that Resilent had vacated the leased premises, NRS reviewed the lease to consider its options. He testified that NRS never sent a notice of termination of the lease to Resilent. He testified that, instead of sending a notice of termination under Paragraph 18(b) of the lease agreement, NRS opted to seek enforcement of rights under paragraph 18(c) (Paragraph 18(c)) of the lease agreement.

At the conclusion of the trial, the district court entered an order in which the court made a variety of findings. The court found that Paragraph 18(c), as set forth above, was "ambiguous as a matter of law, as it does not make grammatical sense, and in the plain and ordinary meaning of the provisions of the paragraph," and the court found that "part of a sentence in the paragraph had been lined out, and neither Siahpush nor Campisi was able to give evidence as to how or why that was done." The court further found that it "must look to the balance of the agreement, as well as other extrinsic evidence before the Court to determine the intent of the parties when the agreement was entered into by them."

Despite Siahpush's testimony, as set forth above, the district court found that "abandonment of the leased premises by Resilent, coupled with NRS' reentry of the premises, and attempting to relet the premises on the open market, makes it clear that a termination of the lease agreement was intended by NRS and Resilent" and that as such, "the provisions of Paragraph 18(b) of the lease agreement must be applied to determine" NRS' damages. The court then concluded that the appropriate measure of damages, under Paragraph 18(b) was "the difference between the rent due for the balance of the lease term, as though the lease had not been terminated, and the fair market rental value of the premises, together with unpaid rent before termination, and the cost of recovering the premises."

The court found that NRS "did not offer competent evidence as to the fair market rental value of the premises, and therefore is not entitled to recover rent due for the balance of the lease term." The court then awarded rental payments that had been due in May, June, and July 2010; Resilent's share of operating expenses for the same period of time; and late fees. The court concluded that the total damages owed to NRS was $29,632.14. The court entered a verdict against Campisi and in favor of NRS. This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, NRS has assigned three errors. First, NRS asserts that the district court erred in finding that Paragraph 18(c) is ambiguous. Second, NRS asserts that the court erred in determining that Paragraph 18(b) is the applicable provision for measuring NRS' damages. Third, NRS asserts that the court erred in finding that NRS had terminated the lease agreement.

On cross-appeal, Campisi has assigned three errors, all of which challenge the sufficiency of NRS' evidence to prove a prima facie case and the court's subsequent awarding of any damages to NRS.

## IV. ANALYSIS

### 1. NRS' APPEAL

#### (a) Ambiguity

NRS first asserts that the district court erred in finding that Paragraph 18(c) is ambiguous. The district court based its conclusion in large part on the fact that a portion of Paragraph 18(c) was presented as "lined out" and that, as a result, the provision is grammatically incorrect. NRS argues that Paragraph 18(c) is not ambiguous and that any difficulty in understanding or reading the provision concerns only an aspect of damages that NRS was not seeking. We find no merit to this assignment of error.

The interpretation of a lease is a question of law that an appellate court decides independently of the district court. *Beveridge v. Savage*, 285 Neb. 991, 830 N.W.2d 482 (2013). See, also, *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000) (construction of contract is matter of law). In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011); *Ruble v. Reich, supra*.

An appellate court views a contract as a whole in order to construe it. *Ruble v. Reich, supra*. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Beveridge v. Savage, supra*; *Bedore v. Ranch Oil Co., supra*; *Ruble v. Reich, supra*. When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Bedore v. Ranch Oil Co., supra*. A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Ruble v. Reich, supra*.

A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties. *Ruble v. Reich, supra*. The fact that the parties have suggested opposing meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Bedore v. Ranch Oil Co., supra*; *Ruble v. Reich, supra*.

The meaning of an unambiguous contract is a question of law. *Ruble v. Reich, supra*. If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Id.* Ambiguous contracts are construed against the drafter. *Beveridge v. Savage, supra*.

- 5 -

In this case, NRS asserted that it was seeking to recover damages pursuant to Paragraph 18(c) of the lease agreement. The district court recognized this prior to the bench trial and granted a motion in limine preventing NRS from adducing the testimony of an expert witness concerning the fair market rental value of the leased premises and indicated that trial would proceed "under . . . the claim of [NRS] that it does not consider the lease in this case to have been terminated."

Paragraph 18 of the lease agreement provides that "[i]n the event of any default or breach [of the lease agreement], in addition to any other right or remedy available to [NRS], either at law or in equity, [NRS] may exert any one or more of the following rights," and then includes subparagraphs (a) through (c), setting forth different potential remedies or methods for calculating damages. Subparagraph (a), set forth above in the "Factual Background" section, provided NRS with the right to "re-enter the Premises immediately and remove the property and personnel of [Resilent]," if NRS gave Resilent notice 10 days prior to any such removal. Subparagraphs (b) and (c) both provided NRS with rights of possession of the premises, as well as a right to monetary damages.

Paragraph 18(b), set forth above in the "Factual Background" section, provided that NRS "may retake the Premises and may terminate this Lease *by giving written notice of termination to* [*Resilent*]. *Without such notice,* [*NRS'*] *retaking will not terminate the Lease.*" (Emphasis supplied.) Under Paragraph 18(b), NRS was also entitled to "recover . . . all damages proximately resulting from the breach, including the cost of recovering the Premises and the difference between the rent due for the balance of the Lease term as though the Lease had not been terminated, and the fair market rental value of the Premises."

Paragraph 18(c) provided as follows:

> (c) [NRS] may relet the Premises or any part thereof for any term without terminating this Lease, at such rent and on such terms as it may, choose. [NRS] may make alterations and repairs to the Premises. In addition to [Resilent's] liability to [NRS] for breach of this Lease, ~~[Resilent] shall be liable for all expenses of the reletting, for any alterations and repairs made,~~ for the rent due for the balance of the Lease term, which sum shall be immediately due [NRS] from [Resilent]. The amount due [NRS] will be reduced by the net rent received by [NRS] during the remaining term of this Lease from reletting the Premises, r [sic] any part thereof. If during the remaining term of this Lease [NRS] receives more than the amount due [NRS] under this sub-paragraph, [NRS] shall pay such excess to [Resilent], but only to the extent [Resilent] has actually made payment pursuant to this sub-paragraph.

The district court concluded that Paragraph 18(c) is ambiguous because "it does not make grammatical sense, and in the plain and ordinary meaning of the provisions of the paragraph, and part of a sentence in the paragraph had been lined out, and neither Siahpush nor Campisi was able to give evidence as to how or why that was done." The court concluded that "reasonable persons would not understand the provisions of Paragraph 18(c)." We agree.

During the trial, after NRS' counsel had conducted direct examination and Campisi's counsel had conducted cross-examination, the court conducted its own examination of Siahpush. The court specifically inquired of Siahpush about the portion of Paragraph 18(c) that had been

"lined out." The court inquired about how the "lining out" occurred and about whether the parties had intended the "lined out" language be excluded from the lease. Siahpush indicated that he did not know how or why it happened or what was intended.

We conclude that a reasonable person would read Paragraph 18(c) and conclude that the portion that is "lined out" was not intended to be part of the paragraph. It would not be reasonable to infer an intention for the portion of the paragraph that includes text with a line through it to be included--indeed, the very purpose of striking through text is typically to demonstrate an intent to remove that language or make it no longer a part of the surrounding text.

If the "lined out" text is removed, Paragraph 18(c) would read as follows:

> (c) [NRS] may relet the Premises or any part thereof for any term without terminating this Lease, at such rent and on such terms as it may, choose. [NRS] may make alterations and repairs to the Premises. In addition to [Resilent's] liability to [NRS] for breach of this Lease, for the rent due for the balance of the Lease term, which sum shall be immediately due [NRS] from [Resilent]. The amount due [NRS] will be reduced by the net rent received by [NRS] during the remaining term of this Lease from reletting the Premises, r [sic] any part thereof. If during the remaining term of this Lease [NRS] receives more than the amount due [NRS] under this sub-paragraph, [NRS] shall pay such excess to [Resilent], but only to the extent [Resilent] has actually made payment pursuant to this sub-paragraph.

This results in a sentence fragment in the middle of the paragraph, providing "In addition to [Resilent's] liability to [NRS] for breach of this Lease, for the rent due for the balance of the Lease term, which sum shall be immediately due [NRS] from [Resilent]."

In this case, the original language of Paragraph 18(c), if the "lined out" text was included and not stricken, would have provided NRS with the right to relet the premises without terminating the lease and the right to make alterations and repairs, and it would have provided that Resilent would be liable for expenses of reletting, for the cost of alterations and repairs, and for the rent due for the balance of the lease agreement, less rent received by NRS for reletting. Although there was no testimony presented to provide any explanation for why portions of these damages were not going to be included, the effect of "lining out" a portion of this paragraph was to remove entirely references to Resilent's being liable for expenses of reletting or for the cost of alterations and repairs.

The version of Paragraph 18(c) that appeared in the lease agreement, if the "lined out" text is entirely stricken, plainly and unambiguously indicates that NRS had the right to relet the premises and the right to make alterations or repairs to the premises. NRS did not exercise either of these rights. What is not clear and unambiguous, however, is what the remainder of the paragraph, including the sentence fragment, means.

It is not clear whether Paragraph 18(c) is intended to apply only as a means of calculating damages *if* NRS actually did relet the premises or make alterations and repairs, or whether Paragraph 18(c) is intended to provide a right to both relet and make alterations and repairs, *and* also to the rent due for the balance of the lease term.

In its entirety, paragraph 18(a) (Paragraph 18(a)) deals with NRS' right to reenter the premises and remove property and personnel. It does not provide the right to do that *and* also a separate right to monetary damages unrelated to reentry and removal of property and personnel.

Paragraph 18(b), in its entirety, deals with NRS' right to terminate the lease and the means of calculating damages if NRS terminated the lease. It does not provide the right to terminate the lease *and* also a separate right to monetary damages unrelated to termination of the lease.

Paragraph 18(c), then, could similarly be read, in its entirety, to deal with NRS' right to relet the premises and the means of calculating damages if NRS had relet the premises. Such a reading of Paragraph 18(c) would be consistent with the plain and unambiguous construction of Paragraph 18(a) and Paragraph 18(b). In determining if a portion of the contract is ambiguous, we are to consider the contract as a whole. See *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000).

Nonetheless, because of the portions of Paragraph 18(c) that were "lined out," the final text of Paragraph 18(c) could be read to suggest that NRS' right to relet the premises and make repairs and alterations is to be "[i]n addition to" Resilent's liability for breach, or to suggest that NRS has the right to relet the premises and make repairs and alterations and that in addition to whatever other liability Resilent might have for breaching the contract, NRS also has the right to rent due for the balance of the lease term. The sentence fragment that results from removing the "lined out" text entirely makes it impossible to infer one clear, plain, and unambiguous meaning of Paragraph 18(c).

NRS concedes in its brief that no extrinsic evidence was adduced at trial to indicate the intent of the parties when agreeing to Paragraph 18(c) in the lease agreement. Nonetheless, NRS argues that if Paragraph 18(c) is ambiguous, it should be construed against Campisi because the contract was drafted by the attorney representing Resilent and Campisi at the time of the lease agreement. We disagree.

Our review of the record does not indicate that this contract was drafted "by" Resilent, Campisi, or the attorney who was representing them at the time of the lease. During the court's examination of Siahpush, the court asked Siahpush, "[W]ho drafted this lease, if you know?" Siahpush responded, "I believe it was between the agent and . . . Campisi's attorney."

There was no further examination or explanation. This testimony merely indicates that, as far as Siahpush knew, the lease agreement was drafted "between the agent and" an attorney representing Resilent and Campisi. There is no indication of who "the agent" was or who "the agent" represented. This testimony only suggests that Siahpush himself was not involved in the drafting, but does not indicate that the lease agreement was drafted "by" Resilent, Campisi, or the attorney who was representing them at the time such that we could construe the provision somehow against them.

We conclude that the district court did not err in concluding that Paragraph 18(c) was ambiguous. The paragraph is not susceptible to only one reasonable interpretation. This assigned error is without merit.

(b) Application of Paragraph 18(b)

NRS next asserts that the district court erred in concluding that Paragraph 18(b) was applicable and was the appropriate provision for determining NRS' damages. We agree.

The district court, after concluding that Paragraph 18(c) was ambiguous, concluded that "abandonment of the leased premises by Resilent, coupled with NRS' reentry of the premises, and attempting to relet the premises on the open market, makes it clear that termination of the lease agreement was intended by NRS and Resilent." The court then concluded that "as such, the provisions of Paragraph 18(b) of the lease agreement must be applied to determine the damages NRS would be entitled to against Resilent for Resilent's default." We disagree with this reasoning, based on the plain and unambiguous language of Paragraph 18(b) and based on the plain and unrefuted testimony presented at trial.

First, the plain and unambiguous language of Paragraph 18(b) clearly indicates that although NRS had the right to terminate the lease and have damages calculated according to Paragraph 18(b), exercising that right would have required NRS to give "written notice of termination to [Resilent]." Paragraph 18(b) specifically provides that "[w]ithout such notice, [NRS'] retaking will not terminate the Lease." The plain and unambiguous language of Paragraph 18(b) specifically requires written notice for NRS to terminate the lease agreement and specifically indicates that retaking possession of the premises without such notice "will not terminate" the lease agreement.

Second, the plain and unrefuted testimony presented at trial indicated that NRS did not intend to terminate the lease agreement. As the court recognized, on the record prior to the commencement of the trial, NRS was asserting at trial that it had *not* terminated the lease. Indeed, the court explicitly recognized this and granted a motion in limine to prevent NRS from presenting expert testimony about fair market rental value under Paragraph 18(b) because NRS was proceeding with trial under Paragraph 18(c). During the trial, Siahpush agreed that after he discovered that the premises had been vacated, he reviewed the lease to decide what NRS' options were. He was asked if he "ever [sent] a notice of termination of the lease" to Resilent, and he responded, "No." He agreed that he had, instead, opted to enforce rights under Paragraph 18(c).

The only testimony adduced at trial indicated that NRS never took action to terminate the lease agreement under Paragraph 18(b). The evidence adduced at trial unequivocally demonstrates that NRS never gave written notice of termination to Resilent, and the plain and unambiguous language of Paragraph 18(b) specifically indicates that NRS' actions of retaking possession of the leased premises, without such written notice of termination, would not operate as a termination of the lease.

If the lease was not terminated under Paragraph 18(b), then the remaining method of calculating damages under Paragraph 18(b) is not applicable. The plain and unambiguous language of Paragraph 18(b) specifically indicates that the method of calculating damages set forth therein is applicable only "[o]n termination." Thus, we conclude that the district court erred in calculating NRS' damages pursuant to Paragraph 18(b).

(c) Resolution

As a result of our above findings, we affirm the district court's conclusion that Paragraph 18(c) is ambiguous. If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000). In this case, the district court was not presented with any extrinsic evidence and the court made no factual findings about the meaning of Paragraph 18(c). Without any findings by the district court about the meaning of Paragraph 18(c), we have no interpretation of Paragraph 18(c) to review.

We conclude that the district court erred in determining that NRS had terminated the lease agreement and in proceeding to calculate damages pursuant to Paragraph 18(b). The plain and unambiguous language of Paragraph 18(b) and the unrefuted testimony adduced at trial indicate that NRS did not take the required steps to terminate the lease, and the calculation of damages pursuant to Paragraph 18(b) is only appropriate if NRS had terminated the lease.

Paragraph 18 of the lease agreement specifically indicates that NRS' rights pursuant to Paragraph 18(a), Paragraph 18(b), and Paragraph 18(c) were "in addition to any other right or remedy available to [NRS], either at law or in equity." In its complaint, NRS made allegations, inter alia, about Resilent's failure to pay rent, operating expenses, and late penalties. The district court made no findings as to whether NRS had sufficiently proven that it was entitled to damages, either at law or in equity, outside of the specific provisions of Paragraph 18(b) and Paragraph 18(c).

This case presents an unusual situation. As noted above, we have concluded that Paragraph 18(c) is ambiguous and have noted that no evidence was adduced to explain that ambiguity or to provide the trial court with a basis for making factual findings about the parties' intent. Although we would normally conclude that the trial court be restricted on remand to making findings on the basis of the record created at trial, where the parties had the opportunity to litigate the issues, and would conclude that neither party should have a second opportunity to present evidence and prove its case, the unusual procedural circumstances here require a different result.

In this case, nobody raised any issue at the trial level about potential ambiguity of the contract. NRS did not assert any ambiguity in its complaint, and Campisi did not assert any ambiguity in his answer or amended answer. There is no indication in the record presented to us or in the briefs of the parties that either party raised any issue about a potential ambiguity in any pretrial proceeding. Instead, it appears that the first mention of a potential ambiguity came when the court examined witnesses on its own, and not as a result of any advocacy by either party.

Further complicating the issue in the present case is the trial court's granting of a motion in limine prior to trial to prevent NRS from calling a proffered expert witness who might have provided testimony beneficial to calculating damages. The court's granting of that motion, according to the record, was largely based on the court's acceptance that NRS was not seeking damages under Paragraph 18(b) and was, instead, seeking damages under Paragraph 18(c) and not on the basis of the merits of Campisi's motion or assertions about late notice about the proffered witness.

- 10 -

The court's pretrial ruling, coupled with the fact that nobody raised an issue about ambiguity until the court raised the issue in the midst of a bench trial, resulted in neither party's presenting evidence necessary for the court to make a factual determination about the meaning of the ambiguous Paragraph 18(c). This also resulted in a lack of evidence to allow calculations of damages outside the context of Paragraph 18(c), which is the provision the parties were litigating. As a result, the trial court is unlikely to be able to make additional necessary findings on the record of the prior trial.

We affirm the district court's conclusion that Paragraph 18(c), as it appeared in the contract, is ambiguous. We reverse the district court's conclusion that the lease was terminated under Paragraph 18(b) and that damages should be calculated pursuant to Paragraph 18(b). We remand the matter to the district court for a new trial where the parties can adduce necessary evidence about the meaning of the ambiguous Paragraph 18(c) and any other calculation of damages outside of paragraph 18.

2. CAMPISI'S CROSS-APPEAL

In his cross-appeal, Campisi has assigned three errors that all challenge the district court's conclusion that NRS had proven a prima facie case and was entitled to some damages. Campisi asserts that NRS did not prove its prima facie case, that Campisi was entitled to a directed verdict, and that NRS was not entitled to damages. We find no merit to Campisi's assertions.

The "Argument" section of Campisi's brief on cross-appeal contains no actual argument or explanation of why his assigned errors have merit. Rather, Campisi presents this court with three pages of recitations of propositions of law and quotations from authorities establishing that the plaintiff in a cause of action bears the burden of proving its case, that proof of damages is a necessary element, and that a directed verdict is appropriate when but one conclusion can be drawn from the evidence. Campisi presents no argument on what it is that NRS failed to prove, why but one conclusion can be drawn, or why that conclusion would be favorable to Campisi.

Based on statements presented in the "Facts" and "Conclusion" sections of Campisi's brief on cross-appeal, it appears that Campisi's primary reasoning for asserting that NRS failed to prove its case and Campisi was entitled to a directed verdict is an assertion that NRS failed to present sufficient evidence of the fair market rental value of the leased premises. As noted above, NRS was prevented from adducing expert testimony on that point by the district court's granting of a motion in limine prior to trial, which granting appears to have been based on the court's conclusion prior to trial that Paragraph 18(b) (including fair market rental value as part of the calculation of damages) was not the applicable provision. The fact that NRS was contending throughout the trial that Paragraph 18(b) was not applicable and the fact that the district court agreed prior to trial--despite reaching the opposite conclusion at the end of the trial--demonstrate why there is not substantial evidence in the record concerning the fair market rental value.

As our discussion above concerning NRS' direct appeal demonstrates, we have concluded that the district court erred in finding that Paragraph 18(b) and its method for calculating damages is applicable in this case. As a result, Campisi's apparent assertion on appeal that insufficient evidence was adduced to support a calculation of damages under Paragraph 18(b) is similarly without merit.

We also note that the record does contain evidence that Resilent breached the contract and that Campisi signed a "personal guarantee" of Resilent's performance. Siahpush testified about Resilent's failure to pay rent under the contract. There was some evidence adduced concerning Siahpush's opinion about the fair market rental value of the property, as well as some evidence concerning NRS' ability to relet the premises. Consistent with our conclusion above, the district court will have to determine, on remand, whether NRS adduced sufficient evidence of damages and, if so, in what amount.

## V. CONCLUSION

We affirm the district court's conclusion that Paragraph 18(c) of the lease agreement is ambiguous. We reverse the district court's conclusion that Paragraph 18(b) of the lease agreement is applicable. We find no merit to Campisi's cross-appeal. We remand the matter to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.